1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10
11

| IDRIS NAWABI, | Case No. 1:13-cv-00272-LJO-SAB |
|---|---|
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTION TO DISMISS |
| v. | |
| CATES, et al., | (ECF Nos. 45, 46, 53, 54) |
| Defendants. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

12
13
14
15
16
17

Currently before the Court is Defendants' Beard, Borges, Brown, Chapnick, Hancock, and Hartley's motion to dismiss.

The Court heard oral arguments on April 29, 2015.  (ECF No. 55.)  Counsel Brian Bush and Maria Weitz appeared for Plaintiff, and counsel William Buranich appeared for Defendants Beard, Borges, Brown, Chapnick, Hancock, and Hartley.  Id.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the April 29, 2015 hearing, as well as the Court's file, the Court issues the following findings and recommendations.

## I.

## PROCEDURAL HISTORY

Plaintiff Idis Nawabi, a former state prisoner proceeding pro se and in forma pauperis,

filed this civil rights action pursuant to 42 U.S.C. § 1983 on February 25, 2013.  On February 20, 2014, Plaintiff's complaint was screened and dismissed with leave to amend for failure to state a claim.  Plaintiff filed a first amended complaint on March 6, 2014.  On March 11, 2014, the first amended complaint was screened and found to state a claim against Defendants B. Borges, R. Chapnick, Hancock, and J. Hartley for deliberate indifference to serious medical needs in violation of the Eighth Amendment.  On October 27, 2014, Plaintiff filed a notice of association of counsel and he is now represented in this action.

On November 4, 2014, Plaintiff filed a second amended complaint.  The case was converted to a regular civil action and an order issued directing the United States Marshal to serve Defendants Brown and Beard.  On February 2, 2015, Defendants filed a motion to dismiss and request for judicial notice.  Plaintiff filed an opposition on April 13, 2015. On April 22, 2015, Defendants filed a reply.

**II.**

**SECOND AMENDED COMPLAINT ALLEGATIONS**

Plaintiff brings this action against Governor Edmund G. Brown, Jr.; Secretary of the California Department of Corrections and Rehabilitation ("CDCR") Jeffrey Beard; Warden of Avenal State Prison ("ASP") James D. Hartley; Chief Medical Officer of ASP R. Chapnick; Registered Nurse B. Borges; and Correctional Officer Hancock alleging deliberate indifference in violation of the Eighth Amendment.

Plaintiff is a thirty-eight year old male of Asian descent.  (Sec. Am. Compl. ¶ 4, ECF No. 28.)  Plaintiff was committed to the custody of the CDCR about September 15, 2004, and was transferred to ASP around September 9, 2007.  (Id. at ¶ 63.)  Plaintiff experienced symptoms of disseminated disease about January 13, 2012.  (Id.)  Plaintiff was originally thought to have pneumonia.  (Id.)  Plaintiff eventually began to experience a rash on his feet and ankles, joint aches, dry skin due to medication, frequent bouts of spinal pain, and migraines.  (Id.)  Plaintiff believes that he contracted Valley Fever while employed doing yard work at ASP.  (Id.)  Plaintiff was diagnosed with pneumonia in his right lung.  (Id. at ¶ 64.)  On June 18, 2014, Plaintiff was deported to Afghanistan.  (Id. at ¶¶ 4, 65.)

Plaintiff alleges that Coccidioidomycosis (hereafter "Valley Fever") is a serious infectious disease which is contracted by inhalation of an airborne fungus that is prevalent in the San Joaquin Valley of California. (Id. at ¶ 15.) The majority of individuals who contract Valley Fever have little to no symptoms which resolve within weeks without treatment. (Id.) However approximately one to five percent of the individuals who contract Valley Fever will develop disseminated disease. (Id.) Disseminated disease is progressive, painful and debilitating and is uniformly fatal once it progresses to meningitis if left untreated. (Id. at ¶ 17.) The disease progresses rapidly to the disseminated form in certain ethnic and racial groups, including as relevant here Asians. (Id. at ¶ 19.)

The disease is treated with certain triazole compounds with must be taken daily and lifelong treatment is recommended. (Id. at ¶ 18.) Some of the extrapulmonary infections require surgical excision of tissue and bone. (Id.) Treatment is expensive and many inmates do not have post release health care to monitor their Valley Fever once released from custody. (Id. at ¶¶ 20-21.)

Plaintiff alleges that Defendants have known of the prevalence of Valley Fever in the San Joaquin Valley for over fifty years. (Id. at ¶ 23.) In June of 1994, the U.S. Centers for Disease Control and Prevention issued an article reporting on the impact of Valley Fever in California which reported that 70 % of the cases in California arose in the San Joaquin Valley. (Id. at ¶ 25.)

In September of 1996, two doctors from the University of California, San Diego School of Medicine published an article that commented on the 1991-1993 Valley Fever Epidemic. (Id. at ¶ 26.) The article reported that the San Joaquin Valley is one of the most highly coccidioidomycosis-endemic regions. (Id.) This same year the National Foundation for Infectious Diseases held an International Conference on Coccidiodomycosis. (Id. at ¶ 27.) The California Health Services Policy Statement on Coccidiodomycosis was included showing that California was spending $60 million on health costs from Valley Fever infections. (Id.) The report noted that specific individuals, such as Plaintiff, were at a higher risk for contracting disseminated disease. (Id. at ¶¶ 27, 71.) The report identified the area around ASP as that most endemic for cocci spores and the most likely area to generate Valley Fever infections. (Id.) The

report identified preventative measures, such as using spherulin skin tests to identify those not vulnerable to disseminated disease, using dust control measures, and wetting the soil.  (Id.)

In November 2004, a memorandum was written by the CDCR Deputy Director of Health Care Services to all health care managers, staff members, and other CDCR officials regarding Valley Fever and its origins in soil fungus.  (Id. at ¶ 28.)  Included was a three page outline of Valley Fever, its cause, diagnosis, treatment, and symptoms.  (Id.)  The memorandum stated that ASP is located in an area which host the cocci fungus in the soil; Valley Fever is potentially lethal making it necessary for clinical staff to maintain high level of suspicion for the disease; wind and construction activity may cause the spores to be blown into the air where it can be inhaled; a percentage of individuals who contract Valley Fever will develop pneumonia or disseminated disease; the risk of disseminated disease is highest in American Indians, Asians, Blacks, and immunocompromised individuals; and symptoms and treatment options.  (Id.)

In 2006, the California Public Health Department ("CPHD") issued a report addressing Valley Fever at ASP suggesting that environmental mitigations measures be implemented to reduce the number of Valley Fever infections experienced by inmates.  (Id. at ¶¶ 32, 73.)  These measures were not implemented by the CDCR.  (Id.)

In 2007, the Annals of the New York Academy of Sciences published an article which pointed out that construction of new prisons in the endemic area had led to a marked increase in Valley Fever cases and identified the high infection rates at the facilities.  (Id. at ¶ 72.)

In June 2007, the Federal Receiver convened a committee consisting of his staff, public health, academic and clinical Valley Fever specialists that resulted in a report being issued with 26 recommendations.  (Id. at ¶ 49.)  The CDCR Statewide Medical Director for the CPHS submitted a report recommending measures for immediate implementation to address the spread of Valley Fever.  (Id. at ¶ 74.)

California Correctional Health Care Services ("CCHCS") published and distributed an orientation manual to all medical personnel that discussed Valley Fever.  (Id. at ¶ 51.)  The manual discussed the Valley Fever epidemic in detail and noted that African Americans, Filipinos and those with compromised immune systems or chronic diseases were at greatly

increased risk of contracting Valley Fever in its deadly form.  (Id.)

In 2008, the governor issued an executive order declaring a statewide drought and encouraged local water agencies and districts to take aggressive action to reduce water consumption.[1]  (Id. at ¶ 57.)  Prison officials interpreted this order as a directive to stop maintaining ground cover.  (Id.)

In December 2011, soil stabilization was implemented on unpaved surfaces at PVSP, but nothing was done at ASP.  (Id. at ¶ 52.)  On April 16, 2012, the Receiver's Public Health and Quality Management Units reported indicated that the Valley Fever health crisis had not abated, noting that from 2006 to 2007, 27 inmates had died of Valley Fever.  (Id. at ¶ 53.)  Subsequent studies by the Receiver's Office found that there were 36 inmate deaths attributable to Valley Fever and 97 % were in the hyperendemic region.  (Id.)

In April 2012, CCHCS published a report that was widely circulated among CDCR staff indicating that no action taken by CDCR between 2006 and 2010 in response to the Valley Fever epidemic had any effect upon the incident rates at ASP.  (Id. at ¶ 54.)  The report reiterated that Valley Fever rates at the hyperendemic prisons were drastically elevated.  (Id.)

On November 14, 2012, the Federal Receiver recommended several actions that could be taken immediately, but were not implemented.  (Id. at ¶ 55.)  On December 3, 2012, Defendants Brown and Beard authorized CDCR to formally request assistance from the CPHD.  (Id. at ¶ 56.)  On April 23, 2013, at the request of the Receiver, additional measures were taken to begin determining what resources would be necessary and available.  (Id. at ¶ 57.)

Approximately forty inmates have died since 2007 as a result of exposure to Valley Fever at ASP and Pleasant Valley State Prison ("PVSP").  (Id. at ¶ 33.)  A November 20, 2007 memo discussed an exclusion policy that had been adopted for all eight prisons in the hyperendemic area that met certain criteria and the criteria did not list inmates who were Asian.  (Id. at ¶ 50.)

Despite this Plaintiff was housed at ASP with no rudimentary measures implemented as recommended by CDCR's medical experts to protect inmates from the disease.  (Id. at ¶ 24.)

---

[1] The Court notes that Plaintiff alleges that Defendant Brown issued this order, but the second amended complaint also alleges that Defendant Brown did not become Governor until 2011.

1    Plaintiff alleges that by virtue of their positions, Defendants Brown, Beard, and Hartley

2    were aware of the Valley Fever crisis through the Federal Receivership in <u>Plata</u>.  (<u>Id.</u> at ¶¶ 45-

3    47.)  Further, Plaintiff alleges that Defendant Brown was aware of the issues due to his position

4    as a defendant in <u>Plata</u>.  (<u>Id.</u> at ¶¶ 48-49.)

5    <u>Defendant Brown</u>

6    Defendant Brown has been Governor of California since January 3, 2011, and supervises

7    and oversees the official conduct of all executive and ministerial officers.  (<u>Id.</u> at ¶ 36.)  He has

8    ultimate authority over the care and treatment of inmates at ASP.  (<u>Id.</u>)

9    <u>Defendant Beard</u>

10   Defendant Beard has been the Secretary of the CDCR since December 27, 2012, and

11   oversees the management and operation of all prison facilities.  (<u>Id.</u> at ¶ 37.)  As Secretary of the

12   CDCR, Defendant Beard is responsible for the policies and practices of the organization,

13   including staff deployment and training.  (<u>Id.</u>)  Defendant Beard was aware of the significant

14   increase in Valley Fever cases through a CDCR memo dated November 20, 2007, which

15   identified the increase in Valley Fever cases and suggested mitigation techniques.  (<u>Id.</u> at ¶ 44.)

16   Defendant Beard was aware of the measure that needed to be taken due to a September 6, 2012

17   letter from Attorney Donald Specter which led to a meeting on September 25, 2012, between

18   <u>Plata</u> counsel, CDCR executives, and the Receiver.  (<u>Id.</u> at ¶ 48.)

19   <u>Defendant Hartley</u>

20   Defendant Hartley served as Acting Warden of ASP in 2007 and was appointed Warden

21   on March 27, 2009.  (<u>Id.</u> at ¶ 38.)  Defendant Hartley knew that the Prison Legal News printed an

22   article in August 2007 about CDCR's executives and official's widespread knowledge of the

23   elevated risk to certain racial and ethnic groups.  (<u>Id.</u> at ¶ 43.)  Defendant Hartley was also aware

24   of the risk through a CDCR memo dated November 20, 2007, which identified the increase in

25   Valley Fever cases and suggested mitigation techniques.  (<u>Id.</u> at 44.)

26   <u>Defendant Chapnick</u>

27   Defendant Chapnick was the Chief Medical Officer at ASP at the time of Plaintiff's

28   incarceration.  (<u>Id.</u> at ¶ 39.)  Defendant Chapnick failed to ensure adequate and timely response

1  to Plaintiff's medical needs and failed to provide proper environmental safeguards, including
2  masks, when Plaintiff was required to dig or handle dirt while employed as yard work crew at
3  ASP between May 2011 and March 2012.  (Id.)

4  Defendant Borges

5  Defendant Borges was a Registered Nurse at ASP and on numerous occasions ignored
6  Plaintiff's requests for treatment.  (Id. at ¶ 41.)  For instance, on March 9, 2012, Plaintiff
7  requested a lay-in to treat "spinal pain;" and Defendant Borges ignored his request although
8  spinal pain is a known suspected sign of disseminated Valley Fever.  (Id.)  Defendant Borges
9  denied Plaintiff's second level appeal and upheld the decision to deny a medical lay in.  (Id.)

10  Defendant Hancock

11  From May 2011 to March 2012, Plaintiff was assigned to the Yard Work Crew under the
12  supervision of Defendant Hancock.  (Id. at ¶ 42.)  Defendant Hancock did not provide Plaintiff
13  with a mask, respiratory filter, or other proper environmental safeguards to reduce his exposure
14  to Valley Fever.  (Id.)

15  **III.**

16  **MOTION TO DISMISS LEGAL STANDARD**

17  Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on
18  the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A
19  complaint must contain "a short and plain statement of the claim showing that the pleader is
20  entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not
21  require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-
22  unlawfully harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell
23  Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a
24  complaint, all well-pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-
25  79.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere
26  conclusory statements, do not suffice."  Id. at 678.

27  In deciding whether a complaint states a claim, the Ninth Circuit has found that two
28  principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint

"may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair to require the defendant to be subjected to the expenses associated with discovery and continued litigation, the factual allegations of the complaint, which are taken as true, must plausibly suggest an entitlement to relief.  Starr, 652 F.3d at 1216.

**IV.**

**ANALYSIS**

**A.    Plaintiff Cannot Bring Claims for Monetary Relief Against Defendants in Their Official Capacity**

Defendants Brown, Beard, and Hartley move to dismiss the claims on the ground that they are entitled to immunity under the Eleventh Amendment and the complaint fails to include sufficient allegations to hold them individually liable for the claims alleged.  Plaintiff does not address the issue of Eleventh Amendment immunity, but counters that the allegations in the complaint are sufficient to show that the defendants were liable for the misconduct alleged.

"The Eleventh Amendment bars suits for money damages in federal court against a state [and] its agencies . . . ." Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007). Even where the state is not named in the action, if the state is the real, substantial party in interest it is entitled to invoke Eleventh Amendment immunity.  Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The Eleventh Amendment does not immunize the State from suits seeking prospective injunctive relief.  Jackson v. Hayakawa, 682 F.2d 1344, 1351 (9th Cir. 1982).  Nor does the Eleventh Amendment bar suits seeking damages from public officials acting in their personal capacities.  Hafer v. Melo, 502 U.S. 21, 30 (1991).  "Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law."  Hafer, 502 U.S. at 25.  In this action, Plaintiff is seeking monetary relief; and therefore Defendants are being sued in their personal capacities.[2]

---

[2] Plaintiff's request for a comprehensive court-supervised program of medical care is not cognizable as discussed below.

1     Section 1983 provides a cause of action for the violation of a plaintiff's constitutional or

2  other federal rights by persons acting under color of state law.  Nurre v. Whitehead, 580 F.3d

3  1087, 1092 (9th Cir 2009); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006);

4  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  However, government officials may not

5  be held liable for the actions of their subordinates under a theory of vicarious liability for section

6  1983 actions, so to state a claim, the plaintiff must demonstrate that each defendant personally

7  participated in the deprivation of his rights.  Iqbal, 556 U.S. at 677; Simmons v. Navajo County,

8  Ariz., 609 F.3d 1011, 1020-21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235

9  (9th Cir. 2009); Jones, 297 F.3d at 934.  This requires the plaintiff to plead that the official has

10  violated the Constitution through his own individual actions and acted with the requisite state of

11  mind to violate the underlying constitutional provision.  OSU Student Alliance v. Ray, 699 F.3d

12  1053, 1069-70 (9th Cir. 2012).  Section 1983 does not contain a state of mind requirement and

13  the requisite state of mind depends upon the constitutional violation alleged.  OSU Student

14  Alliance, 699 F.3d at 1071.

15     Plaintiff states that he experienced symptoms of disseminated disease about January 13,

16  2012.  (ECF No. 28 at ¶ 63.)  Although Plaintiff alleges that he contracted Valley Fever on

17  January 27, 2012, he clearly had Valley Fever prior to this as he alleges he began having

18  symptoms of disseminated disease on January 13, 2012.  Plaintiff was housed at ASP in

19  September 2007, and was assigned to the yard work crew from May 2011 to March 2012.  (Id. at

20  ¶¶ 42, 63.)  The second amended complaint alleges that it was during his time working on the

21  yard crew that Plaintiff contracted Valley Fever.  (Id. at ¶ 63.)

22     Plaintiff is seeking to impose liability on Defendant Beard based upon his position as

23  Secretary of the CDCR.  (Id. at ¶¶ 45-56.)  The second amended complaint alleges that

24  Defendant Beard became Secretary of the CDCR on December 27, 2012, approximately one year

25  after Plaintiff contracted Valley Fever.  Plaintiff may not state a claim against current officials

26  where their conduct did not cause or contribute to a completed constitutional violation.  See

27  George v. Smith, 507 F.3d 605, 609–10 (7th Cir. 2007) (Only those who contribute to a

28  constitutional violation are liable.  "A guard who stands and watches while another guard beats a

9

1  prisoner violates the Constitution; a guard who rejects an administrative complaint about a

2  completed act of misconduct does not.").

3      Plaintiff's second amended complaint alleges no facts to show that prior to December 27,

4  2012, Defendant Beard was employed by the CDCR.  Since Defendant Beard became Secretary

5  of the CDCR after Plaintiff had already contracted Valley Fever, the second amended complaint

6  fails to allege any facts from which the Court could infer that Defendant Beard was liable for

7  Plaintiff contracting Valley Fever.  Plaintiff fails to state a cognizable claim against Defendant

8  Beard.  The Court recommends that Defendant Beard's motion to dismiss be granted.

9      **B.**      **Eighth Amendment Claim**

10      Defendants move to dismiss the complaint against the remaining defendants on the

11  ground that there are insufficient facts alleged to show that they were deliberately indifferent to

12  Plaintiff's serious medical needs or conditions of confinement.

13      1.      <u>Deliberate Indifference Legal Standard</u>

14      To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

15  conditions must involve "the wanton and unnecessary infliction of pain."  <u>Rhodes v. Chapman</u>,

16  452 U.S. 337, 347 (1981).  A prisoner's claim does not rise to the level of an Eighth Amendment

17  violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure

18  of life's necessities,' " and (2) "the prison official 'acted with deliberate indifference in doing

19  so.' " <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting <u>Hallett v. Morgan</u>, 296

20  F.3d 732, 744 (9th Cir. 2002) (citation omitted)).

21      **a.**      **Conditions of Confinement**

22      The Eighth Amendment's prohibition against cruel and unusual punishment protects

23  prisoners not only from inhumane methods of punishment but also from inhumane conditions of

24  confinement.  <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing <u>Farmer v.</u>

25  <u>Brennan</u>, 511 U.S. 825, 847 (1994) and <u>Rhodes</u>, 452 U.S. at 347) (quotation marks omitted).

26  While conditions of confinement may be, and often are, restrictive and harsh, they must not

27  involve the wanton and unnecessary infliction of pain.  <u>Morgan</u>, 465 F.3d at 1045 (citing

28  <u>Rhodes</u>, 452 U.S. at 347) (quotation marks omitted).  Thus, conditions which are devoid of

1  legitimate penological purpose or contrary to evolving standards of decency that mark the

2  progress of a maturing society violate the Eighth Amendment.   <u>Morgan</u>, 465 F.3d at 1045

3  (quotation marks and citations omitted); <u>Hope v. Pelzer</u>, 536 U.S. 730, 737 (2002); <u>Rhodes</u>, 452

4  U.S. at 346.   In order to state a claim for violation of the Eighth Amendment, the plaintiff must

5  allege facts sufficient to support a claim that prison officials knew of and disregarded a

6  substantial risk of serious harm to the plaintiff.  <u>E.g.</u>, <u>Farmer</u>, 511 U.S. at 847; <u>Frost v. Agnos</u>,

7  152 F.3d 1124, 1128 (9th Cir. 1998).

8          **b.       Serious Medical Needs**

9          To state an Eighth Amendment claim based on denial of medical care, an inmate must

10  show "deliberate indifference to serious medical needs."  <u>Jett v. Penner</u>, 439 F.3d 1091, 1096

11  (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).   The two part test for

12  deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by

13  demonstrating that failure to treat a prisoner's condition could result in further significant injury

14  or the 'unnecessary and wanton infliction of pain,' " and (2) "the defendant's response to the

15  need was deliberately indifferent."  <u>Jett</u>, 439 F.3d at 1096; <u>Wilhelm v. Rotman</u>, 680 F.3d 1113,

16  1122 (9th Cir. 2012).

17         Deliberate indifference is shown where the official is aware of a serious medical need and

18  fails to adequately respond.  <u>Simmons v. Navajo County, Arizona</u>, 609 F.3d 1011, 1018 (9th Cir.

19  2010).  "Deliberate indifference is a high legal standard."  <u>Simmons</u>, 609 F.3d at 1019; <u>Toguchi</u>,

20  391 F.3d at 1060.   The prison official must be aware of facts from which he could make an

21  inference that "a substantial risk of serious harm exists" and he must make the inference.

22  <u>Farmer</u>, 511 U.S. at 837.

23         2.      Application to Individual Defendants

24         Initially, the Court shall address the parties' arguments regarding whether the complaint

25  alleges sufficient facts to show that the individual defendants were aware of a serious risk of

26  harm.  Plaintiff's complaint is basically a list of documents or events which occurred over a

27  period of sixty years with conclusory allegations that these provided notice to the individual

28  defendants.

1       Plaintiff alleges that the conclusory allegations against the individual defendants are
2   sufficient to state a claim for relief.  However, under <u>Twombly</u> and <u>Iqbal</u> "a complaint must
3   contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its
4   face." <u>Iqbal</u>, 556 U.S. at 678.  This requires factual content for the court to draw the reasonable
5   inference that the defendant is liable for the alleged misconduct.  <u>Id.</u>  A complaint stops short of
6   the line between probability and the possibility of relief where the facts pled are merely
7   consistent with a defendant's liability.  <u>Id.</u>  "[W]here the well-pleaded facts do not permit the
8   court to infer more than the mere possibility of misconduct," the complaint has not shown that
9   the plaintiff is entitled to relief.  <u>Id.</u>

10      Further, while the court is to accept all "well pleaded factual allegations" in the complaint
11  as true, <u>Iqbal</u>, 556 U.S. at 679, it is not bound to accept as true labels, conclusions, formulaic
12  recitations of the elements of a cause of action or legal conclusions couched as factual
13  allegations, <u>Twombly</u>, 550 U.S. at 555.  The court is not required to accept as true allegations
14  that are contradicted by exhibits in the complaint or matters properly subject to judicial notice.
15  <u>Daniels-Hall v. National Educ. Ass'n</u>, 629 F.3d 992, 998 (9th Cir. 2010).

16      Plaintiff's reliance on publications or events that are related to Valley Fever, without any
17  factual allegations to link them to an individual defendant is not sufficient to infer knowledge to
18  that defendant.  The liberal standards that apply to civil rights complaints may not supply
19  essential elements of the claim that were not pled.  <u>Chapman v. Pier One Imports (U.S.), Inc.</u>,
20  631 F.3d 939, 955 (9th Cir. 2011).  The conclusory allegations in the complaint are not entitled
21  to the presumption of truth, <u>Iqbal</u>, 556 U.S. at 681, and are insufficient to state a plausible claim
22  for relief.

23          **a.      Defendant Brown**

24      Plaintiff alleges that Defendant Brown was deliberately indifferent because he was aware
25  that inmates of Asian descent were at a significant risk of developing disseminated disease after
26  contracting Valley Fever and failed to act.  Plaintiff is seeking to impose liability on Defendant
27  Brown based upon his position as Governor of the State of California.  (<u>Id.</u> at ¶¶ 45-56.)

28      In order to state a claim against Defendant Brown, Plaintiff must allege sufficient facts to

show that Defendant Brown was aware of the risk of harm to Plaintiff.  Plaintiff argues that Defendant Brown had actual knowledge of the risk of harm to Plaintiff based upon documents listed in the complaint.  While Plaintiff contends that these documents were provided to Defendant Brown, the Court finds no factual allegations in the complaint to support an argument that prior to taking office in January of 2011, any document referred to in the complaint was provided to Defendant Brown.

Plaintiff lists documents issued prior to Defendant Brown becoming Governor in 2011, but the mere fact that these documents existed prior to Defendant Brown becoming Governor does not impute knowledge to him.  (ECF No. 28 at ¶¶ 23 (article published in 1940 in American Journal of Public Health), 25 (CDC publication in 1994), 26 (CDC publication in 1996), 27 (summary of articles published in 1996), 43 (article in Prison Legal News published in 2007), 47 (special recommendations by CDHS in 2007), 49, (June 2007 committee recommendations), 57 (Governor's Executive Order in 2008).)  The complaint is devoid of any factual allegations for the Court to infer that Defendant Brown had knowledge of any of these documents.

Similarly, Plaintiff alleges no facts to show why Defendant Brown would have knowledge of documents published within the prison system when he was not the Governor of California.  (ECF No. 28 at ¶¶ 28 (CDCR memorandum in November 2004), 32 (report by Federal Receiver in 2006), 49 (June 2007 committee recommendations), 50 (November 20, 2007 memorandum re exclusion policy).  Although the complaint alleges that Defendant Brown received copies of these items in the normal course of his duties, he was not Governor during this time period and would not have received these documents during the normal course of the duties of the governor.  While Plaintiff's factual allegations are entitled to the presumption of truth, the Court is not bound to accept as true a legal conclusion that is couched as a factual allegation, Iqbal, 556 U.S. at 678, or allegations that are contradicted within the complaint, Daniels-Hall, 629 F.3d at 998.

Additionally, Plaintiff alleges that Defendant Brown was aware of the risk of Valley Fever based upon specific documents issued in 2012, however these documents were issued after Plaintiff contracted Valley Fever.  (ECF No. 28 at ¶¶ 48 (September 6, 2012 letter from Donald

1  Spector), 53 (Receiver's Public Health and Quality Management Units April 16, 2012 report), 54

2  (April 2012 CCHCS report), 55 (November 14, 2012 recommendation by the Federal Receiver),

3  56 (December 3, 2012 request for assistance from CDPH).  Since Plaintiff had already contracted

4  Valley Fever at the time that these documents issued, even if Defendant Brown was aware of

5  them, they do not show that Defendant Brown was liable for harm that occurred prior to their

6  existence.

7         Defendant Brown became Governor of California on January 3, 2011.  (Id. at ¶ 36.)

8  Although Plaintiff contends that the second amended complaint alleges his specific failure to act,

9  the failures alleged are attributable to a time prior to Defendant Brown becoming Governor.  The

10 Court is not required to accept as true those allegations that contradicted by the facts in the

11 complaint.  Plaintiff alleges that Defendant Brown issued a Governor's Executive Order in 2008,

12 however he was not Governor at that time.   Plaintiff's conclusory allegations regarding

13 Defendant Brown's knowledge of facts and documents prior to his becoming Governor and

14 participation in the housing policies of the CDCR are not entitled to the presumption of truth.  In

15 a suit seeking monetary damages from a state official, Plaintiff must set forth sufficient factual

16 allegations for the Court to infer that the individual defendant is liable for the conduct alleged.

17 Defendant Brown is not liable in his personal capacity for the actions of his predecessor.

18        Plaintiff argues that the Court has found the allegations to be sufficient to state a claim

19 against Defendant Brown's co-defendants in Jackson v. Schwarzenegger (hereafter "Jackson"),

20 no. 1:13-cv-01055-LJO-SAB (E.D. Cal.).  However, Jackson is a class action and alleges that

21 inmates susceptible to contracting Valley Fever were harmed by a policy of housing inmates that

22 continued through 2013.  Here, Plaintiff contracted Valley Fever sometime in 2011 and appears

23 to have been diagnosed in January 2012.  Plaintiff's reliance on the orders in Jackson is

24 misplaced.  Plaintiff has failed to allege any facts from which the Court can infer that Defendant

25 Brown was aware of a risk of harm to Plaintiff and failed to act.

26        Finally, Plaintiff's complaint appears to be clearly premised on supervisory liability.  "A

27 supervisor may be liable only if (1) he or she is personally involved in the constitutional

28 deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful

1   conduct and the constitutional violation." <u>Crowley v. Bannister</u>, 734 F.3d 967, 977 (9th Cir.

2   2013) (internal quotation marks and citation omitted).   "Under the latter theory, supervisory

3   liability exists even without overt personal participation in the offensive act if supervisory

4   officials implement a policy so deficient that the policy itself is a repudiation of constitutional

5   rights and is the moving force of a constitutional violation." <u>Crowley</u>, 734 F.3d at 977 (citing

6   <u>Hansen v. Black</u>, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).   The

7   Court finds no plausible allegations in the complaint that Defendant Brown was responsible for

8   the CDCR housing policy or determining where inmates would be housed.

9         Plaintiff fails to state a cognizable claim against Defendant Brown and the Court

10   recommends that Defendant Brown's motion to dismiss be granted.

11   **b.    Defendant Hartley**

12         While the second amended complaint alleges that Defendant Hartley was aware that

13   individuals of Plaintiff's race were at a higher risk of developing disseminated Valley Fever,

14   there are no factual allegations to support such knowledge.   The complaint alleges that a report in

15   1996 recognized that individuals such as Plaintiff were at a higher risk of developing

16   disseminated disease.   (ECF No. 28 at ¶ 27.)   However, even if Plaintiff had included any facts to

17   show that Defendant Hartley had read this article, it is unclear what is meant by "individuals

18   such as Plaintiff."   It is not clear if the article identified Asians as a high risk group or if Plaintiff

19   is merely aligning himself with other high risk groups that were identified in the report.

20         The only allegation specific to Asians is a 2004 memorandum by the Deputy Director of

21   Health Care Services at CDCR that was distributed to health care managers, staff members and

22   other officials.   The complaint alleges that this memorandum stated that the risk and incidence of

23   disseminated disease was highest in American Indians, Asians, African American's, and

24   immunocompromised individuals.   (<u>Id.</u> at ¶ 28.)   However, the complaint alleges that Defendant

25   Hartley was acting warden at ASP since 2007 and warden since 2009.   (<u>Id.</u> at ¶ 38.)   Plaintiff

26   does not include any factual allegations to show that Defendant Hartley had knowledge of this

27   2004 memorandum which was issued prior to his becoming acting warden at ASP.

28         Plaintiff also alleges that Defendant Hartley was aware that in August 2007, the Prison

1   Legal News ran an article that CDCR executives and officials had widespread knowledge that of

2   the substantial risk of harm to high risk groups. (Id. at ¶ 43.) But there is no indication that

3   Asians were specifically identified as a high risk group in this article. Finally, the second

4   amended complaint states that Defendant Hartley was aware of the 2007 memo to staff

5   indicating that individuals who met the exclusion criteria would be transferred out of ASP. (Id.

6   at ¶ 44.) However, the exclusion criteria does not identify Asians as a high risk group. The

7   exclusion policy did not include any race or national origin as part of the excluded individuals

8   which is alleged in Plaintiff's complaint. The remaining "facts" against Defendant Hartley are

9   merely conclusory statements that by virtue of his position he was aware of the Plata litigation.

10      Plaintiff has failed to include any allegations by which the Court can infer that Defendant

11  Hartley was aware that an Asian inmate would be at a high risk of substantial harm from Valley

12  Fever prior to the date that Plaintiff contracted Valley Fever. Plaintiff fails to state a claim

13  against Defendant Hartley and the Court recommends that Defendant Hartley's motion to

14  dismiss be granted.

15      **c.    Defendant Borges**

16      Plaintiff states he is not asserting any claims based on the quality of health care that he

17  received while incarcerated. (ECF No. 28 at ¶ 31.) Plaintiff is seeking future health care and

18  costs based upon CDCR exposing him to Valley Fever and the failure to implement remedial

19  measures. (Id.) However, he alleges claims against Defendant Borges for ignoring his requests

20  for a lay in due to spinal pain as it is a known symptom of disseminated Valley Fever.

21      To the extent that Plaintiff is attempting to assert a claim based upon not diagnosing his

22  Valley Fever or disseminated disease earlier, an allegation by a prisoner that a physician has

23  been merely indifferent or negligent or has committed medical malpractice in diagnosing or

24  treating a medical condition does not state a constitutional claim. Broughton v. Cutter

25  Laboratories, 622 F.2d 458, 460 (9th Cir. 1980); Toguchi, 391 F.3d at 1057. "Medical

26  malpractice does not become a constitutional violation merely because the victim is a prisoner."

27  Estelle, 429 U.S. at 106. Plaintiff's allegations that Defendant Borges was aware of the

28  symptoms of Valley Fever and incorrectly failed to diagnose disseminated disease as the cause of

1   his pain suggest at the most negligence or malpractice, not deliberate indifference.

2       Similarly, Plaintiff cannot state a claim against Defendant Borges due to the denial of the

3   lay-in.  A difference of opinion between a prisoner and prison medical authorities as to proper

4   treatment does not give rise to a claim.  <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1355 (9th Cir. 1981);

5   <u>Mayfield v. Craven</u>, 433 F.2d 873, 874 (9th Cir. 1970).  Plaintiff argues that Defendant Borges

6   ignored Plaintiff's complaints of pain, but the second amended complaint merely alleges that he

7   was denied his request for a lay-in.  Contrary to Plaintiff's argument, the second amended

8   complaint does not include any facts from which the Court could infer that Defendant Borges'

9   denial of his appeal was medically unacceptable under the circumstances or that his request was

10  denied in conscious disregard of an excessive risk to Plaintiff's health.  <u>Jackson v. McIntosh</u>, 90

11  F.3d 330, 332 (9th Cir. 1996).

12      Finally, while Plaintiff contends that Defendant Borges deliberately and consciously

13  ignored his repeated pleas for treatment for spinal pain, Plaintiff does not provide any factual

14  allegations to show that on any occasion he complained to Defendant Borges regarding spinal

15  pain and Defendant Borges failed to respond other than the denial of a lay in as discussed above.

16  Plaintiff has failed to state a cognizable claim against Defendant Borges.   The Court

17  recommends that Defendant Borges' motion to dismiss be granted.

18          **d.    Defendant Chapnick**

19      Plaintiff contends that Defendant Chapnick, the Chief Medical Officer, was deliberately

20  indifferent by failing to provide proper environmental safeguards while Plaintiff was working on

21  the yard work crew from May 2011 and March 2012.

22      Plaintiff relies on Defendant Chapnick's position as chief medical officer to confer

23  liability on Defendant Chapnick; however the second amended complaint merely makes

24  conclusory allegations against Defendant Chapnick without any facts from which the Court can

25  infer that he is liable for the misconduct alleged.  Plaintiff includes no allegations regarding how

26  Defendant Chapnick would be aware that Plaintiff was working on the yard crew and needed

27  environmental safeguards.  Further, while as Chief Medical Officer, Defendant Chapnick could

28  be reasonably responsible for health care at the prison, the position does not reasonably confer

1 responsibility for decisions on housing of inmates at the prison or for providing inmates with
2 environmental safeguards.

3        Similarly, Plaintiff alleges that Defendant Chapnick failed to ensure a timely and
4 adequate response to his medical needs.  Yet the second amended complaint does not include any
5 allegations that Defendant Chapnick treated Plaintiff.  To the extent that Plaintiff attempts to
6 impose liability on Defendant Chapnick for denial of his inmate appeals, as discussed above, the
7 denial of a lay fails to state a claim for deliberate indifference.  Further, Defendant Chapnick's
8 signature on a medical appeal that he knew had been reviewed by other medical personal does
9 not demonstrate the requisite mental state required for a deliberate indifference claim.  <u>Peralta v.</u>
10 <u>Dillard</u>, 744 F.3d 1076, 1087 (9th Cir. 2014) cert. denied, 135 S. Ct. 946 (2015).

11        Plaintiff fails to state a claim against Defendant Chapnick for deliberate indifference in
12 violation of the Eighth Amendment.  The Court recommends that Defendant Chapnick's motion
13 to dismiss be granted.

14        **e.        Defendant Hancock**

15        Plaintiff alleges that Defendant Hancock was his supervisor while he was assigned to the
16 yard work crew from May 2011 to March 2012.  The second amended complaint does not
17 include any allegations that Plaintiff informed Defendant Hancock that he was at a higher risk
18 from Valley Fever and needed any protection when he worked on the yard crew.  Further, the
19 second amended complaint contains no allegations that any of the documents or other methods
20 by which Plaintiff alleges notice was provided to the defendants were applicable to Defendant
21 Hancock.  To the extent that Defendant Hancock could be expected to be aware of the
22 implementation procedures for environmental controls, (ECF No. 46-1 at 6), this document does
23 not identify individuals of Plaintiff's race as high risk.  Plaintiff has not alleged any facts by
24 which the Court can infer that Defendant Hancock was aware that Plaintiff was at a substantial
25 risk of serious harm.  The Court recommends that Defendant Hancock's motion to dismiss be
26 granted.

27        **C.        Request for Medical Treatment**

28        Finally, the second amended complaint seeks the establishment of a comprehensive

1   court-supervised program of medical treatment for Plaintiff.  Defendants move to dismiss the

2   claim on the ground that injunctive relief based on past conduct is not available.  Plaintiff's

3   opposition does not address the motion to dismiss the claim for injunctive relief, and during the

4   April 29, 2015 Plaintiff conceded that he is not able to receive injunctive relief in this action.

5       The Prison Litigation Reform Act places limitations on injunctive relief.  Section

6   3626(a)(1)(A) provides in relevant part, "Prospective relief in any civil action with respect to

7   prison conditions shall extend no further than necessary to correct the violation of the Federal

8   right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective

9   relief unless the court finds that such relief is narrowly drawn, extends no further than necessary

10  to correct the violation of the Federal right, and is the least intrusive means necessary to correct

11  the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).

12      Injunctive relief that is intended to address a present violation of federal law is not barred

13  by the Eleventh Amendment.  Papasan v. Allain, 478 U.S. 265, 278 (1986).  However, relief that

14  is intended to compensate a victim for a past violation of federal law is barred.  Papasan, 478

15  U.S. at 278.  "[W]hen a plaintiff sues a state official alleging a violation of federal law, the

16  federal court may award an injunction that governs the official's future conduct, but not one that

17  awards retroactive monetary relief."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89,

18  102-03 (1984); see also Peralta, 744 F.3d at 1084 (A state can be compelled to correct

19  constitutional violations, "but such a lawsuit could provide no redress for past constitutional

20  violations because the state is protected by sovereign immunity, 'a fundamental aspect of the

21  sovereignty which the States enjoyed before the ratification of the Constitution, and which they

22  retain today. " (citation omitted)).  Accordingly, retroactive relief is barred by the Eleventh

23  Amendment.  Pennhurst State Sch. & Hosp., 465 U.S. at 103.

24      In this instance, Plaintiff is not seeking prospective relief.  The remedy Plaintiff is

25  seeking would effectively be an award of damages for a past violation of federal law which is

26  barred by the Eleventh Amendment.  Green v. Mansour, 474 U.S. 64, 70 (1985.)  Since Plaintiff

27  is not being subjected to a continuing violation of federal law, he cannot receive injunctive relief

28  in this action.  Green, 474 U.S. at 71.  The Court recommends that Defendants' motion to

1  dismiss the claim for injunctive relief be granted without leave to amend.

2      **D.      Qualified Immunity**

3      Defendants contend that they are entitled to qualified immunity for the decision to house

4  inmates at ASP and for any failure to provide environmental safeguards.  Plaintiff argues that it

5  was clearly established that housing inmates in endemic areas and failing to implement

6  environmental safeguards would violate an inmate's Constitutional rights.

7      1.      Qualified Immunity Legal Standard

8      The doctrine of qualified immunity protects government officials from civil liability

9  where "their conduct does not violate clearly established statutory or constitutional rights of

10 which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)

11 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled

12 to qualified immunity the court uses a two part inquiry.  Saucier v. Katz, 533 U.S. 194, 200

13 (2001).  The court determines if the facts as alleged state a violation of a constitutional right and

14 if the right is clearly established so that a reasonable official would have known that his conduct

15 was unlawful.  Saucier, 533 U.S. at 200.

16     The district court is "permitted to exercise [its] sound discretion in deciding which of the

17 two prongs of the qualified immunity analysis should be addressed first in light of the

18 circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.  The inquiry as to

19 whether the right was clearly established is "solely a question of law for the judge."  Dunn v.

20 Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't.

21 556 F.3d 1075, 1085 (9th Cir. 2009)).  In deciding whether officials are entitled to qualified

22 immunity, the court is to view the evidence in the light most favorable to the plaintiff and resolve

23 all material disputes in the favor of the plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th

24 Cir. 2003).

25     2.      The Question at Issue Is Whether Housing Inmates In Prisons In Areas Endemic
            For Valley Fever, A Naturally Occurring Soil-Borne Fungus Which Can Lead To
26          Serious Illness, Would Violate the Eighth Amendment

27     Initially, Plaintiff relies on this Court's finding in Jackson that Defendants were not

28 entitled to qualified immunity on similar claims.  In the initial finding and recommendation

1  addressing qualified immunity in <u>Jackson</u>, 1:13-cv-01055-LJO-SAB (E.D. Cal. February 20,

2  2014), this Court framed the issue as whether failing to protect high risk inmates from the risk of

3  developing disseminated disease would violate the Eighth Amendment.   <u>Id.</u> at 16:21-18:23.

4  However, upon consideration of the issue in the current motion, the Court finds this is not the

5  correct question.  Therefore, the Court finds that it is appropriate to address the substance of the

6  qualified immunity claim in this motion to dismiss.  Further to the extent that this Court

7  previously cited <u>Helling v. McKinney</u>, 509 U.S. 25 (1993), for the proposition that Defendants

8  are not entitled to qualified immunity; it now finds that this action is distinguishable.

9       Defendants contend that they are entitled to qualified immunity because there is no

10 clearly established right not to be housed in the Central Valley or otherwise be subjected to the

11 environmental risk of Valley Fever.  Plaintiff contends that Defendants are defining the right too

12 narrowly.  Plaintiff argues that the right to be addressed here is the significant increased risk of

13 infection from Valley Fever.

14      It is the plaintiff that bears the burden of demonstrating that the right was clearly

15 established at the time that the defendants acted.  <u>May v. Baldwin</u>, 109 F.3d 557, 561 (9th Cir.

16 1997).  Defendants cannot be held liable for a violation of a right that is not clearly established at

17 the time the violation occurred.  <u>Brown v. Oregon Dep't of Corrections</u>, 751 F.3d 983, 990 (9th

18 Cir. 2014).  A constitutional right is clearly established when its contours are "sufficiently clear

19 [so] that a reasonable official would understand that what he is doing violates that right."  <u>Hope</u>

20 <u>v. Pelzer</u>, 536 U.S. 730, 739 (2002).  In light of the preexisting law the lawfulness of the officials

21 act must be apparent.  <u>Id.</u> at 739.  The court is to look to the state of the law at the time the

22 defendants acted to see if it gave fair warning that the alleged conduct was unconstitutional.  <u>Id.</u>

23 at 741.

24      Further, the Supreme Court has emphasized that it is often difficult for an official to

25 determine how relevant legal doctrine will apply to the specific situation that is faced and that is

26 why qualified immunity protects "all but the plainly incompetent or those who knowingly violate

27 the law[.]"  <u>Estate of Ford v. Ramirez-Palmer</u>, 301 F.3d 1043, 1049 (9th Cir. 2002).  It is not

28 sufficient for Plaintiff to merely argue the general rule that prison officials cannot deliberately

1 disregard an excessive risk of harm.  Estate of Ford, 301 F.3d at 1051.

2        When we are considering whether the official had notice that his conduct was unlawful,
3 we look not to the harm that results, but what condition the inmate was exposed to that could
4 cause the harm.  In Helling, the question was not how serious the harm to the inmate could be
5 from second hand smoke, but whether exposing the inmate "to levels of ETS that pose an
6 unreasonable risk of serious damage to his future health" would violate the Eighth Amendment.
7 509 U.S. at 35.  The condition the inmate was exposed to was ETS due to being housed with a
8 cellmate who smoked five packages of cigarettes per day.

9        While Plaintiff argues that in determining qualified immunity we consider the risk of
10 disseminated disease, Plaintiff was not exposed to disseminated disease.  Plaintiff alleges that he
11 was housed at ASP where spores that cause Valley Fever are endemic.  Plaintiff contends that he
12 is at an increased risk of developing disseminated infection from Valley Fever due to his race.  If
13 Plaintiff is correct that we look only to the harm that could result, the right to be free from any
14 act that caused significant harm would be clearly established and Defendants could never be
15 granted qualified immunity.  That is clearly not the intent of the law.

16        During the April 29, 2015 hearing, Plaintiff argued that qualified immunity cannot mean
17 that the first time a right is violated the defendants are not liable.  But where a right is not clearly
18 established a defendant is entitled to qualified immunity from damages.  "[G]overnment officials
19 performing discretionary functions generally are shielded from liability for civil damages insofar
20 as their conduct does not violate clearly established statutory or constitutional rights of which a
21 reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  That is
22 not to say that the plaintiff is without remedy for his injury as he could seek tort damages for
23 violations of state law.  But the question we address here is whether it is clearly established that
24 the conduct at issue would violate the inmate's federal rights.

25        When confronted with a claim for qualified immunity we are to ask "[t]aken in the light
26 most favorable to the party asserting the injury, do the facts alleged show that the officer's
27 conduct violated a constitutional right."  Brosseau v. Haugen, 543 U.S. 194, 197 (2004).  This
28 inquiry is to be taken in light of the specific context of the case and not as a broad general

proposition.  Brosseau, 543 U.S. at 198.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 199 (quoting Saucier, 533 U.S. at 202).  Prison officials are entitled to qualified immunity where it is not clearly established that the conduct complained of would violate the Eighth Amendment.  Pearson, 555 U.S. at 243.

The Supreme Court has told us that we are not to define clearly established law at a high level of generality.  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011).  While Plaintiff relies on the risk of harm and argues the general rule, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  Wilson v. Layne, 526 U.S. 603, 615 (1999).  The Ninth Circuit recently addressed a deliberate indifference claim in which an arrestee was placed in the drunk tank and was attacked by another detainee.  Castro v. Cnty. of Los Angeles, __ F.3d.__, 2015 WL 1948146, at *1-2 (9th Cir. May 1, 2015).  The right at issue was not merely the right to be free from a risk of violence, but was found to be "the right to be free from violence at the hands of other inmates."  Id.

Here, Plaintiff alleges that he was exposed to Coccidioides fungal spores that exist in the soil and when inhaled can cause Valley Fever.  The Court finds that the question to be addressed here is whether it was clearly established that housing inmates in prisons in areas endemic for Valley Fever, a naturally occurring soil-borne fungus which can lead to serious illness, would violate the Eighth Amendment.[3]

### 3. It is not clearly established that environmental exposure of inmates to Valley Fever would violate the Eighth Amendment

Qualified immunity shields an official from personal liability where he reasonably believes that his conduct complies with the law.  Pearson, 555 U.S. at 244.  " 'Qualified

---

[3] In determining how to frame the right at issue, the Court considers Helling.  In Helling, the inmate was alleging that he was exposed to a condition created by other prisoners smoking cigarettes with exposed him to environmental tobacco smoke ("ETS").  The Helling court did not frame the right as a manmade condition that could cause a serious risk of harm.  In Helling, the Supreme Court considered whether exposing the inmate "to levels of ETS that pose an unreasonable risk of serious damage to his future health" would violate the Eighth Amendment.  509 U.S. at 35.  The court considered the specific substance to which the inmate alleged he was exposed that would cause him harm.  Similarly in this instance, the Court considers that Plaintiff is alleging he was exposed to spores which can cause Valley Fever.  However, as discussed below, the Court is not requiring a case to be directly on point, but is analyzing whether prior case law would place Defendants on notice that the exposure of inmates to Valley Fever would violate their rights under the Eighth Amendment.

1  immunity gives government officials breathing room to make reasonable but mistaken

2  judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the

3  law.' " Stanton v. Sims, 134 S.Ct. 3, 5 (2013) (citations omitted).  In determining whether the

4  defendant is entitled to qualified immunity, the court is to determine if "a reasonable officer

5  would have had fair notice that [the action] was unlawful, and that any mistake to the contrary

6  would have been unreasonable."  Chappell v. Mandeville, 706 F.3d 1052, 1056-57 (9th Cir.

7  2013) (quoting Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1060–61 (9th

8  Cir. 2003)).

9      Prison officials are entitled to qualified immunity where it is not clearly established that

10  the conduct complained of would violate the Eighth Amendment.  Pearson, 555 U.S. at 243.

11  Under the Eighth Amendment, prison officials cannot be deliberately indifferent to conditions of

12  confinement that create a substantial risk of significant harm.  Farmer v. Brennan, 511 U.S. 825,

13  847 (1994).  To prove a violation of the Eighth Amendment a plaintiff must "objectively show

14  that he was deprived of something 'sufficiently serious,' and make a subjective showing that the

15  deprivation occurred with deliberate indifference to the inmate's health or safety."  Thomas v.

16  Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citations omitted).  "A deprivation is sufficiently

17  serious when the prison official's act or omission results in the denial of the minimal civilized

18  measure of life's necessities."  Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (internal

19  punctuation and citations omitted).  A plaintiff satisfies the objective component of whether he

20  has been exposed to a sufficiently serious deprivation by showing that he is incarcerated under

21  conditions that pose a substantial risk of serious harm.  Lemire v. California Dep't of Corrections

22  and Rehabilitation, 726 F.3d 1062, 1075 (9th Cir. 2013).  Therefore, the Court shall examine the

23  state of the law to determine if it is clearly established that housing inmates in prisons in areas

24  endemic for Valley Fever would violate the Eighth Amendment.

25      **a.    There does not have to be case directly on point, but prison officials must
       have had fair notice that the conduct violates the Eighth Amendment**

26

27      It is not required that there be a case directly on point before concluding that the law is

28  clearly established, "but existing precedent must have placed the statutory or constitutional

question beyond debate." Stanton, 134 S.Ct. at 5 (quoting al-Kidd, 131 S.Ct. at 2085).  It was in Hope that the Supreme Court established that a case need not be fundamentally similar for prison officials to have notice that their conduct would violate the Eighth Amendment.

In Hope, an inmate appealed the finding that prison officials were entitled to qualified immunity for handcuffing him to a hitching post for hours as a form of punishment.  Hope, 536 U.S. at 735.  The district court found that although the actions violated the Eighth Amendment, the officials were entitled to qualified immunity.  Id.  The Eleventh Circuit affirmed, stating that, while there were two analogous cases, there were no cases with materially similar facts to place defendants on notice.  Id.  The Supreme Court reversed holding that precedent does not require a factual situation to be fundamentally similar, but the prior decision must give reasonable warning that the conduct at issue would violate a constitutional right.  Id. at 740.

At the time the defendants acted there were two cases, Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974) and Ort v. White, 813 F.2d 318 (11th Cir. 1987), which held that corporal punishment which runs afoul of the Eighth Amendment, such as handcuffing inmates to a crate or cell for long periods of time and denial of drinking water after the prisoner terminates his resistance, are not permitted.  Hope, 536 U.S. at 741-43.  The Court concluded that "Hope was treated in a way antithetical to human dignity—he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous[,]" not out of necessity, but as a punishment for prior conduct.  Id. at 745.  Gates and Ort provided sufficient notice that this conduct would be unconstitutional.  Id.  In applying the holding in Hope, this Court is to determine if there is case law that would have provided Defendants with sufficient notice that environmental exposure of inmates to Valley Fever would violate their Eighth Amendment rights.

Significantly, the Eighth Amendment prohibits punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  Estelle v. Gamble, 429 U.S. 97, 102 (1976) (citations omitted).  Conditions that cannot be said to be cruel and unusual under contemporary standards of decency do not violate the Eighth Amendment.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

1  **b.  Review of Supreme Court, Circuit, and District Court Decisional Law Shows That Defendants Do Not Have Notice That Environmental Exposure to Valley Fever Would Violate the Eighth Amendment**

2

3  In determining if the law is clearly established we first look to binding precedent.

4  Chappell, 706 F.3d at 1056.  If there is none on point, we look to other decisional law, including

5  the law of other circuits and district courts.  Id. at 1056; Osolinski v. Kane, 92 F.3d 934, 936 (9th

6  Cir. 1996).  The Court finds no Supreme Court or published Ninth Circuit case that has

7  addressed whether an inmate's environmental exposure to Valley Fever or any other

8  environmental organism would be a violation of the Eighth Amendment.[4]  Therefore, the Court

9  looks to other conditions of confinement cases addressing environmental exposure to determine

10  if the right at issue is clearly established.

11  i.  The Court finds no Supreme Court or Ninth Circuit precedent to place Defendants on notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment

12

13  a)  **Helling is distinguishable from the situation confronted by prison officials here**

14

15  Plaintiff relies on Helling to argue that the right to be free from environmental exposure

16  to Valley Fever is clearly established.  In Helling, the Supreme Court addressed whether

17  environmental exposure to environmental tobacco smoke ("ETS") would violate the Eighth

18  Amendment.  The plaintiff alleged that he was housed with a cellmate who smoked up to five

19  packages of cigarettes per day exposing the plaintiff to ETS that posed a risk to his health.

20  Helling, 509 U.S. at 27.  A court trial was held and after a directed verdict, judgment was entered

21  for the defendants.  Id. at 29.  The Court of Appeals affirmed the lower court decision on the

22
23
24
25
26
27
28

---

[4] There are two unpublished Ninth Circuit cases which remanded Valley Fever cases without discussion of what would be required to state a claim under the Eighth Amendment.  See Smith v. Schwarzenegger, 393 Fed.App'x 518, 2010 WL 3448591 (9th Cir. 2010) (not beyond a doubt that plaintiff could prove no set of facts entitling him to relief); Johnson v. Pleasant Valley State Prison, 505 Fed.App'x 631, 2013 WL 226722 (9th Cir. 2013) (given the low pleading threshold, dismissal of plaintiff's action at the pleading stage was improper, expressing no opinion as to the sufficiency or merits of the allegations).  "An unpublished disposition is, more or less, a letter from the court to parties familiar with the facts, announcing the result and the essential rationale of the court's decision."  Hart v. Massanari, 266 F.3d 1155, 1178 (9th Cir. 2001).  "[T]he disposition is not written in a way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not announced in a way that makes it suitable for governing future cases."  Hart, 266 F.3d at 1177-78.  "Unpublished dispositions and orders of [the Ninth Circuit] are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  CTA9 Rule 36-3.

basis of qualified immunity, but held that, although the plaintiff did not have a constitutional right to a smoke free environment, plaintiff had stated a cause of action under the Eighth Amendment by alleging he was involuntarily exposed to levels of ETS that posed an unreasonable risk of harm to his future health.  Id.  In support of the judgment, the Court of Appeals noted the scientific opinion supporting plaintiff's contention that exposure to ETS could endanger an individual's health and "society's attitude had evolved to the point that involuntary exposure to unreasonably dangerous levels of ETS violated current standards of decency."  Id.

The issue the Supreme Court addressed was whether the plaintiff had stated an Eighth Amendment claim by alleging his compelled exposure to ETS posed an unreasonable risk to his health.  Helling, 509 U.S. at 31.  The Supreme Court rejected the defendants' argument that only deliberate indifference to an inmate's current serious health problem is actionable under the Eighth Amendment, and held that the Eighth Amendment protects against future harm.  Id. at 33. The Supreme Court remanded stating:

> The Court of Appeals has ruled that McKinney's claim is that the level of ETS to which he has been involuntarily exposed is such that his future health is unreasonably endangered and has remanded to permit McKinney to attempt to prove his case.  In the course of such proof, he must also establish that it is contrary to current standards of decency for anyone to be so exposed against his will and that prison officials are deliberately indifferent to his plight.  We cannot rule at this juncture that it will be impossible for McKinney, on remand, to prove an Eighth Amendment violation based on exposure to ETS.
> Id. at 35.
>
> [W]ith respect to the objective factor, determining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

Id. at 36.

The Court finds that Helling is distinguishable for two interrelated reasons.  First, in this instance, Plaintiff was exposed to a naturally occurring fungus that lives in the soil in the Central Valley.  Helling did not address a naturally occurring condition that causes the same risk to those in the surrounding community.  Second, the Helling court recognized that society's attitude had

1  evolved to the point that involuntary exposure to unreasonably dangerous levels of ETS violated

2  current standards of decency.  That is not the case here where society accepts exposure to Valley

3  Fever.[5]  Since <u>Helling</u> is distinguishable as it does not address an environmental condition that

4  exposes the general community to a risk of harm, it does not provide reasonable warning that the

5  conduct at issue here would violate a constitutional right.  <u>Hope</u>, 536 U.S. at 740.

6       The Court therefore turns to precedential Ninth Circuit decisions addressing exposure of

7  inmates to an environmental condition to determine if there is a case sufficiently similar to give

8  Defendants reasonable warning that the conduct here would violate the Eighth Amendment.  The

9  majority of Ninth Circuit cases that consider environmental conditions of confinement address

10  exposure to ETS which the Court finds to be distinguishable as discussed above.

11       **b)    Neither Ninth Circuit decisions nor common sense would clearly establish**
12       **that housing inmates in an area endemic to Valley Fever would violate the**
         **Eighth Amendment**

13       The Ninth Circuit has recognized that a right can be established by precedent or by

14  common sense.  <u>Newell v. Sauser</u>, 79 F.3d 115, 117 (9th Cir. 1996).  In determining whether the

15  law is clearly established in this instance, the Court therefore considers both precedent and

16  whether common sense would clearly establish the right.

17       Plaintiff argues that <u>Kelley v. Borg</u>, 60 F.3d 664 (9th Cir. 1995), establishes the right not

18  to be exposed to a significant risk of harm.  In <u>Kelley</u>, the Ninth Circuit considered a case in

19  which an inmate complained of fumes in his cell from which officers refused to remove him

20  during a lockdown.  60 F.3d at 665.  A short time later, the inmate became unconscious and was

21  taken to the infirmary.  <u>Id.</u> at 666.  The appellate court affirmed the district court's holding that it

22  was clearly established that this was deliberate indifference to a serious medical need.  <u>Id.</u> at 666-

23  67.  While Plaintiff argues that <u>Kelley</u> establishes that Defendants had notice that their conduct

24  would violate the Eighth Amendment, <u>Kelley</u> does not stand for the general proposition that any

25  condition that would cause substantial harm to an inmate would violate the Eighth Amendment.

26  ---

[5] As discussed in detail below, over a million people live in areas in which the cocci spores are endemic and are
subjected to the risk of contracting Valley Fever.  Further, tens of thousands of individuals live in those areas which
27  are considered to be hyperendemic and are exposed to the risk of contracting Valley Fever.  Additionally, the
employees who work within the prison and those who visit the prison are exposed to the cocci spores and tolerate
28  the risk of contracting Valley Fever.

1   Therefore, Plaintiffs' reliance on <u>Kelley</u> to show that the right at issue here is clearly established

2   is misplaced.

3         Where an inmate is in imminent danger from an environmental hazard, case law is not

4   required to determine that the right was clearly established.  This is an instance where common

5   sense would lead a reasonable prison official to determine that this would violate an inmate's

6   rights.  <u>Newell</u>, 79 F.3d at 117.  However, it is not so obvious for every instance where an inmate

7   is subjected to an environmental condition and complains that it violates the Eighth Amendment.

8   <u>See</u> <u>Sawyer v. Cole</u>, No. 3:10-cv-00088-RCJ-WGC, 2012 WL 6210039, *4 (D. Nev. Dec. 12,

9   2012) <u>aff'd</u>, 563 F. App'x 589 (9th Cir. 2014) (qualified immunity applies where inmate alleged

10  he became ill due to mold, fungus, bacteria and otherwise unsanitary conditions in his cell.

11  "[T]he right against seriously dangerous unsanitary conditions cannot be held to be 'clear' at a so

12  high level of generality that any claim of uncleanliness necessarily rises to the level of a

13  constitutional violation against which an officer has no qualified immunity.")  The right alleged

14  here is not so obvious that common sense would dictate the result of the inquiry.

15        In <u>Wallis v. Baldwin</u>, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit considered an

16  inmate's claim that prison officials violated his rights when he was required to clean attics which

17  included cleaning up insulation containing asbestos without adequate protective gear or training.

18  70 F.3d at 1075.  The evidence did not show that any minimum exposure to asbestos was

19  considered safe.  <u>Id.</u> at 1075.  The plaintiff presented evidence that the prison officials were

20  aware of the existence of the asbestos and during the time he was assigned to clean the attic the

21  plaintiff had complained to officials about the asbestos.  <u>Id.</u> at 1077.  The court held that

22  exposing the inmate to a known carcinogen in which there is no known safe level for human

23  exposure violated the Eighth Amendment.[6]  <u>Id.</u> at 1078.  Therefore, it is clearly established that

24  prison officials cannot expose an inmate to conditions to which no human can safely be exposed.

---

25  [6] The Fifth Circuit held that for an inmate to state a claim for exposure to carcinogenic asbestos particles, he must
26  show that he was exposed to unreasonably high levels of environmental toxins.  <u>Herman v. Holiday</u>, 238 F.3d 660, 664 (5th Cir. 2001).

27        In <u>Powell v. Lennon</u>, 914 F.2d 1459 (11th Cir. 1990), the Eleventh Circuit found that housing inmates in a
28  dormitory in which workers removed pipes from the dormitory releasing large quantities of asbestos into the air would violate the Eighth Amendment.

Since Valley Fever spores are not considered a substance to which no human can safely be exposed this does not place Defendants on notice that environmental exposure to Valley Fever would violate the Eighth Amendment.

In Keenan v. Hall, 83 F.3d 1083 (9th Cir. 1996), an inmate brought suit complaining his conditions of confinement violated the Eighth Amendment.  One of the inmate's numerous claims alleged that "food at the IMU was 'spoiled, tampered with, cold, raw, [and failed] to meet a balanced nutritional level,' and that the water was 'Blue/Green in Color and Foul Tasting.' Keenan, 83 F.3d at 1091 opinion amended on denial of reh'g, 135 F.3d 1318 (9th Cir. 1998). The Ninth Circuit held that "[f]ood that is spoiled and water that is foul would be inadequate to maintain health." Id.  However, exposing an inmate to an environmental condition that naturally occurs in the area is not similar to failing to provide fresh food and clean water.

The Court finds that none of these cases would provide sufficient notice to Defendants that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment.

ii.     Out of circuit precedent does not provide sufficient notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment

Finding no Supreme Court or Ninth Circuit precedent that would place Defendants on notice that housing inmates in areas endemic for Valley Fever would violate the Eighth Amendment, the Court next considers out of circuit decisional law for guidance on the issue. The Eleventh Circuit considered a class action in which inmates on death row alleged that they were subjected to cruel and unusual punishment by being exposed to summertime temperatures in their cells of between eighty to one hundred degrees.  Chandler v. Crosby, 379 F.3d 1278, 1283-86 (11th Cir. 2004).  The appellate court noted that while an inmate need not wait for a tragic event to occur before seeking relief, he must show that the challenged conditions are extreme.  Chandler, 379 F.3d at 1289.  A plaintiff must show at the very least that there is an unreasonable risk of serious damage to his future health or safety and, quoting Helling, that the risk is one that society chooses not to tolerate.  Id.  The appellate court then examined other cases involving exposure to heat and ventilation.  Id. at 1291-95.  The court first found that the Eighth Amendment applied to an inmate's claim of inadequate cooling and ventilation and a claim may

1   be stated based upon the conditions in isolation or in combination.  Id. at 1294.  Second, the
2   Eighth Amendment is concerned with the severity and the duration of the conditions to which the
3   inmate is exposed.  Id.  Third, a prisoner's mere discomfort, without more, does not offend the
4   Eighth Amendment.  Id.  The appellate court found that the heat the plaintiffs were exposed to
5   was not unconstitutionally excessive.  Id. at 1297.  Considering the conditions the inmates were
6   exposed to, the inmates did not meet the high bar to state a claim under the Eighth Amendment.
7   Id. at 1298;  cf. Gates v. Cook, 376 F.3d 323 (5th Cir. 2004) (affirming injunctive relief for
8   inmates subjected to profound isolation, lack of exercise, stench and filth, malfunctioning
9   plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient
10  mental health care, and exposure to psychotic inmates in adjoining cells which violates the
11  Eighth Amendment).

12       In Rish v. Johnson, 131 F.3d 1092 (4th Cir. 1997), the Fourth Circuit considered inmates
13  claims that requiring them to clean up blood and other bodily fluids from environmental surfaces
14  without providing them with protective gear violated the Eighth Amendment.  131 F.3d at 1094.
15  The inmates had volunteered to work as orderlies.  Id.  As orderlies, they cleaned up after
16  inmates who were infected with human immunodefiency virus (HIV) and hepatitis B which both
17  may prove fatal.  Id. at 1094-95.  The district court denied the defendants' motion for summary
18  judgment finding that "a reasonable person, especially a federal officer trained in the prevention
19  of infection or charged with ensuring that inmates take the required precautions, would know
20  that they were violating [the] inmates' constitutional rights if they refused to provide the required
21  equipment or training."  Id. at 1095.  The appellate court reversed, finding "there is no clearly
22  established law dictating that prison officials are deliberately indifferent to a substantial risk of
23  bodily harm if they fail to provide equipment to inmates to ensure that they may follow universal
24  precautions in performing the duties of an orderly."  Id. at 1101.

25       In a case which this Court finds to be factually analogous to this action, Carroll v.
26  DeTella, 255 F.3d 470 (7th Cir. 2001), the plaintiff alleged that he was exposed to drinking water
27  that was contaminated with radium.  255 F.3d at 471-72.  The plaintiff contended that over a four
28  year period he was exposed to unsafe levels of radium that were in excess of the maximum set by

the Federal Environmental Protection Agency, while prison guards were provided with bottled water.  Id. at 472.  There were 80 other Illinois water systems that also had radium in their water supply, but there was no evidence regarding the actual radium level in those communities' water supply.  Id.  The Seventh Circuit found that:

> Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather than certain and immediate, Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).  But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not. McNeil v. Lane, 16 F.3d 123, 125 (7th Cir.1993); Steading v. Thompson, 941 F.2d 498 (7th Cir.1991); Harris v. Fleming, 839 F.2d 1232, 1235–36 (7th Cir.1988); Clemmons v. Bohannon, 956 F.2d 1523, 1527 (10th Cir.1992) (en banc).  Many Americans live under conditions of exposure to various contaminants.  The Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans.  McNeil v. Lane, supra, 16 F.3d at 125; Givens v. Jones, 900 F.2d 1229, 1234 (8th Cir.1990).  It would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures.  If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

Carroll, 255 F.3d at 472-73.

The Seventh Circuit also considered an asthmatic prisoner's claim that prison officials violated the Eighth Amendment by allowing him to be exposed to ETS from which he cannot escape due to his captivity.  Steading, 941 F.2d at 499.[7]  At this time, smoking was common in offices, restaurants, and other public places throughout the United States and the rest of the world.  Steading, 941 F.2d at 500.  The Seventh Circuit compared subjecting prisoners to tobacco smoke to restaurant owners subjecting their patrons to smokers and found that exposure to smoke could not be considered punishment.  Id.  The appellate court found that "[p]risoners allergic to the components of tobacco smoke, or who can attribute their serious medical conditions to smoke, are entitled to appropriate medical treatment, which may include removal

---

[7] The Court does note that Schroeder v. Kaplan, 60 F.3d 834 (9th Cir. 1995) (unpublished), discusses that the Ninth Circuit has recognized that housing an inmate with a sensitivity to smoke in a cell with a heavy smoker may violate the Eighth Amendment.  However, the Court does find that exposure to cigarette smoke is distinguishable as it was not a risk that society chose to tolerate at that time.  Schroeder did not address whether exposure to a risk that society chooses to tolerate would violate the Eighth Amendment.

from places where smoke hovers." <u>Steading</u>, 941 F.2d at 500.  But subjecting inmates to the same conditions that society is subjected to was not punishment and did not violate the Eighth Amendment.  <u>Id.</u>  <u>Carroll</u> and <u>Steading</u> stand for the proposition that subjecting inmates to conditions of confinement to which society is also subjected does not violate the Eighth Amendment.

   iii. <u>Exposure to Valley Fever is a risk that society chooses to tolerate</u>

   Having reviewed Supreme Court and circuit case law, the Court finds that there is no case that would place Defendants on notice that housing inmates in an area that is endemic for Valley Fever would violate the Eighth Amendment.  In this instance, as in <u>Carroll</u>, where the radium was in the water supply of 80 communities, a large number of individuals in the Central Valley are exposed to Valley Fever spores in the environment.  A review of the 2013 census shows that over a million people reside in the San Joaquin Valley where the risk of Valley Fever is present.[8] <u>See</u> United States Census Bureau, State & County QuickFacts, Kern County, California (2013 estimated population of 864,124) http: //www.census.gov/quickfacts/#table/PST045214/ 06029,00;  Fresno County California (2013 estimated population of 955,272) http://quickfacts.census.gov/qfd/states/06/06019.html last visited Feb. 6, 2015.  Much of the litigation regarding Valley Fever originates from inmates incarcerated at ASP which is located in Avenal, California, or PVSP which is located in Coalinga, California.  (ECF No. 28 at ¶ 33.) Tens of thousands of people live, work, and raise their families in the vicinity of ASP and PVSP. <u>See</u> United States Census Bureau, Avenal, California http://quickfacts.census.gov/qfd/states/ 06/0603302.html (last visited February 2, 2015) (2013 estimated population of 14,176); City of Coalinga HomePage located at http://www.coalinga.com/?pg=1 (last visited February 2, 2015) (approximately 18,000 residents in Coalinga); Pleasant Valley State Prison HomePage located at http://www.cdcr.ca.gov/ Facilities_Locator/PVSP.html.  Additionally, West Hills Community

---

[8] Under the Federal Rules a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Judicial notice may be taken "of court filings and other matters of public record."  <u>Reyn's Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 n.6 (9th Cir. 2006); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001).

College is located in Coalinga.   See City of Coalinga HomePage located at http://www.coalinga.com/?pg=1 (last visited February 9, 2015).   It cannot be disputed that a significant number of individuals from all of the high risk categories identified by Plaintiff live in those areas identified as hyperendemic.[9]   See Consolidated Compl. at ¶¶ 108, 145 (African Americans, Hispanics, Filipinos, and other Asians).   Carroll, which dealt with exposure to a condition of confinement that is common to the surrounding community, provides support for Defendants position that exposing inmates to the risk of Valley Fever does not violate the Eight Amendment.

Spores which cause Valley Fever exist in the San Joaquin Valley and the fact that the prison is located in this area is the basis of Plaintiff's allegations.   As in Carroll, prison officials have not created the spores in the soil and the claim is that Defendants are failing to provide a "maximally" safe environment.   However, the Court finds no case law indicating that prison officials are required to provide an environment that is safer than that of the surrounding communities.

No governmental agency has found that the San Joaquin Valley or the community where ASP is located is unsafe for general human habitation or for any specific group of individuals in the general population.   Prison officials have no notice that they must provide safer conditions for the inmates than the residents in the area in which the prisons are located.   Similarly, Plaintiff identifies certain racial and ethnic groups as being at a higher risk of developing disseminated infection, but non-imprisoned individuals of these same groups would be subjected to this same risk and society tolerates them residing in the San Joaquin Valley, even in these areas with the highest concentration of Valley Fever spores.   It is not clearly established by decisional case law that environmental exposure of inmates to Valley Fever would violate the Eighth Amendment since it is a risk that is tolerated by society.   Carroll, 255 F.3d at 472-73.

---

[9] Kern County's population is comprised of 9.6% of individuals over 65 years of age, 6.3% African American, 2.7% American Indian, 50.9% Hispanic, and 4.2% Asian.
http://www.census.gov/quickfacts/#table/PST045214/06029,00.  Fresno County's population is comprised of 10.9% of individuals over the age of 65, 5.9% African American, 3% American Indian, 51.6% Hispanic, and 10.5% Asian. http://quickfacts.census.gov/qfd/states/06/06019.html.  Avenal is comprised of 4% of individuals over the age of 65, 10.5% African American, 1.2% American Indian, 71.8% Hispanic, and .7% Asian. http://quickfacts.census.gov/qfd/states/06/0603302.html.

**c.      Lower court decisions in the Ninth Circuit demonstrate that whether and when exposure to Valley Fever would violate the Eighth Amendment is subject to debate**

i.      District Court decisions on Valley Fever

The Court also looks to lower court decisions in the Ninth Circuit that have addressed whether environmental exposure to Valley Fever can state a claim to determine if Defendants would have notice that they are violating the rights of the inmates by housing them in endemic areas.   Recently, District Judge O'Neill found that the mere exposure to Valley Fever was sufficient to state a claim for deliberate indifference.   Beagle v. Schwarzenegger, No. 14-cv-00430-LJO-SAB (E.D. Cal. July, 25, 2014) at ECF No. 74.   However, as Judge O'Neill recognized in his opinion in Beagle, the weight of authority is that an inmate cannot state a claim for violation of the Eighth Amendment based on confinement in a location where Valley Fever is present. Beagle, No. 14-cv-00430-LJO-SAB (July 25, 2014) (ECF No. 74 at 9:18-10:13).

Since exposure to Valley Fever is clearly a risk that society chooses to tolerate, this Court has found that merely being housed in an area in which Valley Fever was prevalent is not sufficient to state a claim.   See also Moreno v. Yates, No. 1:07-cv-1404-DGC, 2010 WL 1223131, at *2 (E.D. Cal. March 24, 2010) (granting summary judgment for defendants as society tolerates the risk of Valley Fever).   Even today, courts considering this issue have held the same.   See Williams v. Biter, No. 1:14-cv-02076-AWI-GSA PC, 2015 WL 1830770, at *3 (E.D. Cal. April 9, 2015 (finding that being housed at Kern Valley State Prison where Valley Fever spores are present insufficient to state a claim); Hines v. Youssef, No. 1:13-cv-00357-AWI-JLT, 2015 WL 164215, at *4 (E.D. Cal. January 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate."); Sullivan v. Kramer, No. 1:13-cv-00275-DLB-PC, 2014 WL 1664983, at *5 (E.D. Cal. April 23, 2014) (being confined in an area where Valley Fever spores exist is insufficient to state a claim for deliberate indifference). The weight of authority shows that it is not clearly established that housing an inmate in an area

where Valley Fever is prevalent would violate his Eighth Amendment rights.  See Walker v. Andrews, No. 1:02-cv-05801-AWI-GSA-PC, 2011 WL 3945354, at *19 (E.D. Cal. Sept. 7, 2011) adopted by ECF No. 183 ("The law is clear that the fact that Plaintiff was confined in a location where [V]alley [F]ever spores existed which caused him to contract [V]alley [F]ever fails to state a claim under the Eighth Amendment.").

Courts within this district have differed on whether an inmate who is subject to a risk factor can state a claim for deliberate indifference.  See Smith v. Brown, No. 1:12-cv-0238-AWI-JLT (PC), 2012 WL 1999858, at *4 (E.D. Cal. June 4, 2012) (allegation of increased risk of Valley Fever due to asthma insufficient to state a claim); Jones v. Igbinosa, No. , at *3-4 (E.D. Cal. July 19, 2010) (allegation that African-American inmate at greater risk of contracting Valley Fever is insufficient to state a claim); Gilbert v. Yates, No. 1:09CV02050 AWI DLB, 2010 WL 5113116, at *4 (E.D. Cal. Dec. 9, 2010) subsequently aff'd, 479 F. App'x 93 (9th Cir. 2012) (inmate alleging risk factors for Valley Fever did not state a claim for deliberate indifference for failure to transfer him from PVSP); Hunter v. Yates, No. 1:07-cv-00151-AWI-SMS-PC, 2009 WL 233791, at *3 (E.D. Cal. January 30, 2009) (inmate alleging high risk of contracting Valley Fever states a claim under the low pleading standard); Humphrey v. Yates, No. 1:09-cv-00075-LJO-DLB (PC), 2009 WL 3620556, at * 3 (E.D. Cal. October 28, 2009) (finding allegation that inmate caught Valley Fever twice due to preexisting respiratory conditions is sufficient to state a claim); Barnhardt v. Tilton, No. 1:07-cv-00539-LJO-DLB (PC), 2009 WL 56004, at *4 (E.D. Cal. January 7, 2009) (inmate's allegation that his diabetes placed him at increased risk of contracting Valley Fever is insufficient to show a serious risk of harm to inmate's health).

More recent cases have found that an inmate claiming to be at an increased risk of contracting Valley Fever could state an Eighth Amendment claim.  See Lua v. Smith, No. 1:14-cv-00019-LJO-MJS, 2014 WL 1308605, at *2 (E.D. Cal. Mar. 31, 2014) (first prong of deliberate indifference claim is satisfied where plaintiff identifies a factor responsible for increasing the risk of contraction or severity of infection); Sparkman v. California Dep't of Corrections and Rehabilitation, No. 1:12-cv-01444-AWI-MJS (PC), 2013 WL 1326218, at *3 (E.D. Cal. March 29, 2013) (inmate with chronic lung disease meets first prong of Eighth

1   Amendment standard); Holley v. Scott, No. 1:12-cv-01090-MJS (PC), 2013 WL 3992129, at *3

2   (E.D. Cal. Aug. 1, 2013) (collecting cases).   But many courts have found that the allegation of

3   increased risk of contracting Valley Fever is insufficient to state a claim for violation of the

4   Eighth Amendment.   Smith v. Brown, No. 1:12-cv-0238-AWI-JLT (PC), 2012 WL 1574651, at

5   *4 (May 3, 2012) (allegation that inmate was African-American is insufficient to state a claim);

6   Harvey v. Gonzalez, No. CV 10-4803-VAP (SP), 2011 WL 4625710, at *3 (C.D. Cal. July 27,

7   2011) (even if inmate alleged that he was at high risk of contracting Valley Fever and defendants

8   were aware of his risk that would be insufficient to state a claim for violation of the Eighth

9   Amendment); Clark v. Igbinosa, No. 1:10-cv-01336-DLB PC, 2011 WL 1043868, at *2 (E.D.

10  Cal. March 21, 2011) (allegation that African-American inmate at greater risk of contracting

11  Valley Fever is insufficient to state a claim); Schroeder v. Yates, No. 1:10-cv-00433-OWW-

12  GSA PC, 2011 WL 23094, at *1, (E.D. Cal. January 4, 2011) (inmate alleging COPD and

13  emphysema fails to state a claim); James v. Yates, No. 1:08-cv-01706-DLB (PC), 2010 WL

14  2465407, at * 4 (E.D. Cal. June 15, 2010) (allegation of higher risk due to medical conditions is

15  not sufficient to state a claim where prison officials found inmate did not meet criteria for

16  transfer).

17          ii.     Plata order to adopt cocci exclusion policy does not establish an Eighth
                    Amendment right not to be exposed to Valley Fever
18

19          Plaintiff also argues that the June 2013 order in Plata v. Brown, No. C01-1351 TEH,

20  2013 WL 3200587(N.D. Cal. June 24, 2013), supports the argument that housing inmates in

21  endemic areas would violate the Eighth Amendment.   In Plata, the court was considering the

22  plaintiffs' request that the Receiver's cocci exclusion policy be implemented.   The court ordered

23  that the CDCR "adopt a modified version of the Receiver's cocci exclusion policy that reflects

24  Defendants' agreement to transfer all inmates who are classified as 'high-risk' under the medical

25  classification system and is consistent with the factors identified by the American Thoracic

26  Society as creating an increased risk of severe cocci."   2013 WL 3200587, at *14.   The Court

27  notes that Plata is a class action in which the prison health care system was found to be deficient

28  and the Federal Receiver was appointed to oversee the system.   The Plata court only considered

37

the effects of Valley Fever on inmates and did not address whether housing inmates in the San Joaquin Valley where they are exposed to Valley Fever would violate the Eighth Amendment. Further, while a state may adopt a policy which is more generous than what the Constitution requires, United States v. Heffner, 420 F.2d 809, 812 (4th Cir. 1969), the policy itself does not establish that environmental exposure to Valley Fever violates the Eighth Amendment.

It is rare that in the absence of "any published opinions on point or overwhelming obviousness of illegality" that a court could "conclude that the law was clearly established on the basis of unpublished decisions only."  Sorrels v. McKee, 290 F.3d 965, 971 (9th Cir. 2002). Review of the case law demonstrates that while the law in this area is in the process of becoming established, it is not clearly established even today that housing inmates, even those at an increased risk for developing disseminated disease, in an endemic area would violate the Eighth Amendment.

       iii.    Prior orders finding Defendants' are not entitled to qualified immunity

Finally, Plaintiff cites to both Jackson and Smith v. Schwarzenegger, No. 07-cv091547 SRB (PC), 2015 WL 106337 (E.D. Cal. Jan.7, 2015) which found that defendants are not entitled to qualified immunity based upon Helling.  However, as discussed above, this Court finds Helling to be distinguishable as it did not deal with a naturally occurring condition to which a large segment of society chooses to tolerate.  Further, the Court finds that the right to be addressed was incorrectly defined in Jackson.  Therefore, the Court does not find the reasoning in the opinions to be persuasive on the issue of qualified immunity in this instance.

Based upon the review of case law within this Circuit, it is subject to debate whether housing an inmate, even a high risk inmate, in an area where he would be exposed to Valley Fever would violate the Eighth Amendment.

       **d.**    **Inmates at an Increased Risk of Developing Disseminated Disease**

In this action, Plaintiff is alleging that he was at an increased risk of developing disseminated disease due to his race.  Plaintiff argues that even if it is not clearly established that it would violate the Eighth Amendment to house any inmate in the endemic area, the fact that certain inmates are at a higher risk of harm is sufficient to place prison officials on notice that

1    they cannot be housed in these areas.  At the April 29, 2015 hearing, the Court inquired how

2    Defendants would be on notice of when an increased risk would be sufficient to violate the

3    Eighth Amendment.  Plaintiff responded that any increased risk is sufficient to place Defendants

4    on notice that housing inmates in an endemic area would violate the inmate's rights.

5         However, more than half of the residents of the affected areas fall with the groups that

6    Plaintiff identifies as being at high risk.  See footnote 9.  In Castro, the Ninth Circuit recognized

7    that "an officer is entitled to qualified immunity when the transition from a risk of *some* harm to

8    a *substantial* risk of *serious* harm would not have been clear to a reasonable prison official."

9    Castro, 2015 WL 1948146, at *7 (emphasis in original).

10        Additionally, as discussed above, courts are not clear on whether an inmate can state a

11   claim or what would be required for an inmate to state a claim due to being at an increased risk

12   of contracting Valley Fever.  In this instance, the Court finds that it would not be clear to prison

13   officials at what point an inmate's increased risk of developing disseminated disease due to his

14   race or health conditions would rise to a substantial risk of serious harm.[10]

15        Therefore, Defendants are entitled to qualified immunity for housing inmates who are at

16   an increased risk of developing disseminated disease in the endemic areas.

17        **e.    The Law is Not Clearly Established that Exposing an Inmate to the
              Environmental Risk of Valley Fever Violates the Eighth Amendment**
18

19        The Court finds no binding precedent, and lower court cases are unclear, on when or if it

20   would be a violation of an inmate's Eighth Amendment rights to be housed in an area where

21   Valley Fever is prevalent.  While Plaintiff alleges that he was subjected to Cruel and Unusual

22   Punishment by being housed in areas where Valley Fever is prevalent, at least a million

23   individuals live in the San Joaquin Valley and are exposed to Valley Fever.  Similarly, tens of

24   thousands of individuals live, work, and raise families in the areas that are the most endemic.

25        Neither the State of California nor the federal government have implemented any

26

27   ───────────────
     [10] Similarly, while Plaintiffs allege that the rate of infection within the prison was higher than the rate of infection
     for residents within the surrounding community, it would not be clear at what point this would transition to a
28   substantial risk to inmates that would violate the Eighth Amendment.

standards or restrictions on exposure to Valley Fever.   Similarly, there have been no recommendations issued to any sector of the general public to relocate out of the area.   Prison officials could reasonably believe that since the government has not found it unsafe for non-imprisoned individuals to reside in areas in which Valley Fever spores are prevalent that it would not violate the Eighth Amendment to incarcerate inmates in these same areas.   Carroll, 255 F.3d at 473.

Finally, it is clear that even for those individuals that are at a higher risk from Valley Fever, exposure to Valley Fever is a risk that society tolerates.   The Seventh Circuit found it would be inconsistent to find that prisoners are entitled to a healthier environment than substantial numbers of non-imprisoned Americans.   Carroll, 255 F.3d at 473.   More than half of the individuals who reside in the endemic areas belong to the racial groups which Plaintiff identifies as high risk.   See footnote 9.

The Court finds that it is not beyond debate whether housing inmates in prisons in areas endemic for Valley Fever, a naturally occurring soil-borne fungus which can lead to serious illness, would violate their rights under the Eighth Amendment.   al-Kidd, 131 S. Ct. at 2083.   For the reasons stated, the Court finds that the right alleged here is not clearly established. Defendants did not have fair notice that exposing inmates to an environmental risk of Valley Fever would violate the Eighth Amendment.[11]   Chappell, 706 F.3d at 1057 (court is to consider whether an officer would have fair notice that his conduct was unlawful and that any mistake to the contrary would be unreasonable).   Therefore, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's claims arising out of being housed at a prison where they were exposed to Valley Fever.[12]   It is recommended that Defendants' motions to dismiss on the

---

[11] The Court is aware of two unpublished Ninth Circuit cases which addressed exposure to a contagious disease. Brigaerts v. Cardoza, 952 F.2d 1399, at *2 (9th Cir. 1992) (repeated exposure to contagious disease may violate the Eighth Amendment), and Muhammad v. Turbin, 199 F.3d 1332, at *1 (9th Cir. 1999) (exposure to chicken pox and tuberculosis).   The Court finds these cases distinguishable.   Contemporary standards of decency are violated where an individual with active chicken pox or tuberculosis exposes healthy individuals to the disease.   While today's society does not tolerate healthy individuals being exposed to people with contagious diseases, Valley Fever is not a contagious disease and as discussed exposure to Valley Fever is a risk that society tolerates.

[12] Plaintiff also alleges that Defendants were deliberately indifferent by failing to implement mitigation measures to protect him from exposure to Valley Fever.   However, for the reasons discussed above, Defendants are entitled to qualified immunity for not implementing mitigation measures.   While Plaintiff contends that Defendants should

1   ground that they are entitled to qualified immunity be granted.

2        **E.      Leave to Amend**

3        Plaintiff requests that he be granted leave to file an amended complaint.  Rule 15(a) is

4   very liberal and leave to amend 'shall be freely given when justice so requires.'"  <u>Amerisource</u>

5   <u>Bergen Corp. v. Dialysis West, Inc.</u>, 465 F.3d 946, 951 (9th Cir. 2006) (quoting Fed. R. Civ. P.

6   15(a)).  However, courts "need not grant leave to amend where the amendment:  (1) prejudices

7   the opposing party; (2) is sought in bad faith; (3) produces an undue delay in the litigation; or (4)

8   is futile."  <u>Id</u>.

9        As the previous magistrate judge found that Plaintiff stated a claim for deliberate

10  indifference to medical needs, Plaintiff should be granted an opportunity to amend the complaint

11  as to those claims.

12                                        **V.**

13                       **CONCLUSION AND RECOMMENDATION**

14       Based on the foregoing, IT IS HEREBY RECOMMENDED that:

15       1.      Defendants Beard, Borges, Brown, Chapnick, and Hancock, and Hartley's motion

16               to dismiss be granted;

17  _____

18  have implemented measures including "landscaping, paving, soil stabilization, limiting and strictly controlling
    excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions,
    and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions",

19  inmates incarcerated at prisons in the San Joaquin Valley are exposed to the same environmental conditions that
    exist for those non-incarcerated individuals residing in the same areas.  The San Joaquin Valley is California's top

20  agricultural producing region and three quarters of California's dairy cows are located here.  United States
    Environmental Protection Agency, Region 9 Strategic Plan, 2011-14, located at

21  http://www.epa.gov/region9/strategicplan/sanjoaquin.html.  The San Joaquin Valley is home of the worst air quality
    in the country and has some of the highest rates of childhood asthma due to the unique topography and wind

22  patterns.  <u>Id.</u>  The San Joaquin Valley contains large areas of exposed soil which is stirred up by wind and farming
    exposing residents to Valley Fever spores.  The Court takes judicial notice of information displayed on government

23  websites and news releases where neither party can dispute the accuracy of the information contained therein.
    <u>Daniels –Hall v. National Educ. Ass'n</u>, 629 F.3d 992, 998-99 (9th Cir. 2010) (government websites); <u>In re American</u>

24  <u>Apparel, Inc. Shareholder Litigation</u>, 855 F.Supp.2d 1043, 1062 (C.D. Cal. 2012) ("Courts in the Ninth Circuit
    routinely take judicial notice of press releases.").  <u>See</u> <u>Blowing dust forecast for Valleys west side Tuesday</u>, Fresno

25  Bee, (October 13, 2014), http://www.fresnobee.com/2014/10/13/4177039_blowing-dust-forecast-for-
    valleys.html?rh=1; <u>14 Killed, 114 Hurt in I-5 Pileups:Traffic: More than 100 vehicles collide in dust storm north of</u>

26  <u>Coalinga</u>, Los Angeles Times (November 30, 1991), http://articles.latimes.com/1991-11-30/news/mn-94_1_dust-
    storm (last visited May 18, 2015); <u>Gusts shroud Valley in dust as cold storm moves in</u>, Fresno Bee (June 5, 2012),

27  http://article.wn.com/view/2012/06/05/ gusts_shroud_valley_in_dust_as_cold_storm_moves_in/ (last visited May
    18, 2015).  As discussed herein, the Court finds no precedent to place Defendants on notice that they are required to

28  provide inmates with a safer environment that that of non-incarcerated individuals residing in the same area.

2.    Defendants' motion to dismiss Plaintiff's request for the establishment of a comprehensive court-supervised program of medical treatment be granted without leave to amend;

3.    Defendants' motion for qualified immunity for housing Plaintiff in an area where he was exposed to Valley Fever be granted; and

4.    Plaintiff be granted leave to file an amended complaint to attempt to cure the deficiencies in his Eighth Amendment medical care claims.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __May 19, 2015__

_____

UNITED STATES MAGISTRATE JUDGE